Emerson D. FOLK and National Business Forms, Incorporated, a Corpo-ration, Plaintiffs,

v.

STANDARD BUSINESS FORMS, INC., Defendant.

Civ. A. No. 1404.

United States District Court
W. D. North Carolina,
Charlotte Division.

June 16, 1967.

Thomas A. Lockhart, Charlotte, N. C., William M. Pate, Atlanta, Ga., for plain-tiffs.

Henry M. Whitesides, Gastonia, N. C., Fred B. Helms, Charlotte, N. C., for de-fendant.

## MEMORANDUM DECISION

WARLICK, Chief Judge.

I have here for decision a civil contempt proceeding, arising out of certain contractual relationships, which were agreed upon and entered into at that time when the defendant purchased all of the stock owned by plaintiff, Emerson D. Folk individually in the defendant corporation. This cause has been of long duration and first came to the court's attention on January 2, 1959 when an action seeking relief by way of a declaratory judgment was filed by the plaintiffs herein. Following its inception and on many occasions thereafter, hearings have been had, orders have been issued, arguments have been made, and ultimately and finally the cause, in view of the many factors involved, comes to the court for a decision. Much obstinacy has been shown, certain testimony, from time to time has appeared to be difficult of belief, and many roadblocks have been cast into this legal area, which in a sense has been like unto the proverbial pulling of eye teeth. But from it all, following a careful study, the following Findings of Fact are made which will be subsequently correlated into final Conclusions of Law.

The matter came before the Court under an order dated September 23, 1966 to show cause why the plaintiffs and each of them should not be adjudged guilty of a contempt of this court, which motion was obviously objected to by plaintiffs, but allowed following extensive argument. The date for appearance was set down for the 25 of October, 1966.

## FINDINGS OF FACT:

That on October 21, 1957, Emerson D. Folk, one of the plaintiffs, sold to the defendant 800 shares of common capital stock which he owned in the defendant corporation. That at such time defendant had outstanding 1600 shares of common stock, the remaining 800 shares not otherwise sold by plaintiff in the defendant corporation belonged to and were owned by one W. E. Hendricks. Folk and Hendricks seemingly had reached an impasse in their dealings with the affairs of the defendant corporation and decided evidently to part company. Hence one sold and the other bought.

As a part of such sale and delivery of certain stock, a buy-sell agreement was entered into and as a consideration of the sale of said stock, by plaintiff to defendant, the defendant was paid the following purchase price.

*"Purchase Price.* The purchase price for the said 800 shares of stock shall be $478,500.00, plus the lot and cottage owned by Buyer at Lake Lure, North Carolina, and the contents thereof, plus the life insurance policies now carried by Buyer on the life of the Seller, said house and lot and insurance policies to be considered as being transferred at their book value as of November 30, 1957, plus the 1954 Chrysler automobile, owned by Buyer and heretofore used by Seller, in the Buyer's business. The purchase price is to be payable as follows:

$114,000.00—in cash at closing December 31, 1957

Lake Lure Property—By deed delivered January 2, 1958.

Insurance policies—By assignment on January 2, 1958

$364,500.00 in cash on January 2, 1958."

Furthermore, the defendant and the plaintiff, Emerson D. Folk, entered into a contract simultaneously with the above mentioned by-sell agreement, which, among other things, provided:

*Payments for agreement not to compete and for services.*

The Company shall pay to Folk, and Folk shall accept from the Company for his refraining from entering a competitive business as is hereinafter set forth and for his services during the non-competing period the total sum of $130,000.00, which shall be payable in equal weekly installments at the end of each week during such period."

Each and every of the considerations were paid the contract therein was fully

complied with and is not in any wise now disputed.

That among other things such buy-sell agreement between plaintiff Folk and the defendant provided:

"The seller agrees that he will not after December 31, 1957, unless acting with the Company's written consent and with the written consent of W. E. Hendricks for a period of ten (10) years thereafter, directly or indirectly, own, manage, join, operate, control, or participate in, or be connected as an officer, director, employee, partner, advisor, counsellor, or otherwise with any business in North Carolina, South Carolina, or Virginia, under any name similar to the Buyer's name or any business, incorporated or not, in any similar manner to or directly or indirectly in competition with Standard Business Forms, Inc. But nothing in this paragraph shall prevent the Seller from discussing in casual conversation the generalities of the "business form" field. Also, nothing herein shall prohibit the Seller from purchasing stock or other securities of any corporation which shall have any securities listed upon any recognized securities exchange. Also, nothing in this paragraph shall prevent the Seller from doing anything in any place, other than in North Corolina, South Carolina, and Virginia. The Seller likewise agrees for the aforesaid 10 year period, not to hire, without the written prior approval of W. E. Hendricks, any person who has been an employee of Standard Business Forms, Inc., within the three years prior to the date of this agreement, except this shall not apply to Charles B. Brown, except that Seller shall not hire him to work in the said period in the State of Georgia. The Seller acknowledges that the remedy at law for breach of the foregoing will be inadequate and that the Buyer will be entitled to injunctive relief for any breach of the covenants of this paragraph by the Seller."

Thereafter in 1958 Emerson D. Folk, one of plaintiffs, organized a corporation under the laws of the State of Tennessee, which was given the name of National Business Forms, Inc. That at such first meeting of the corporation Emerson D. Folk was named its President and occupied such position at the time of taking of his deposition on November 19, 1964, and actually has been throughout the life of National Business Forms, Inc., its sole and only President.

On January 2, 1959, plaintiffs herein instituted this action in this court by filing their complaint on which summons was issued, seeking a declaratory judgment under the court's interpretation of Paragraph 6, of the above set out buy-sell agreement, dated October 21, 1957, between Folk and this defendant.

Thereafter the record discloses that on January 26, 1959, the defendant herein filed its answer to the complaint of plaintiffs and among other things, following admissions and denials of various numbered allegations, set out a counterclaim seeking therein a declaratory judgment under allegations in the answer that the plaintiffs were hiring former employees of the defendant in violation of Paragraph 6 of the buy-sell agreement.

Subsequently and on August 12, 1959, following many discussions, some hearings, and various legal maneuvers, the plaintiffs and the defendant entered into a consent judgment and a consent permanent injunction, which said two documents were duly signed by all of parties involved therein and by their respective attorneys, and on such being presented to the court, was signed as a consent judgment and a consent permanent injunction. Among the terms is found the following:

"Now therefore, it is ordered, adjudged and decreed as follows:

1. That the individual plaintiff, Emerson D. Folk, his heirs, executors, administrators, legal representatives, successors, and assigns and the corporate plaintiff, National Business Forms, Inc., its officers, agents, servants, employees, attorneys, successors or assigns and all other persons in active concert or participation with them or

either of them be and they are hereby permanently enjoined, inhibited and restrained from, directly or indirectly, through any other person, firm or corporation or in any manner, until after December 31, 1967:

Attempting to hire, hiring, employing or continuing to employ, without the prior written approval of W. E. Hendricks, any person except Charles B. Brown, as set forth in the agreement of October 21, 1957, who was or has been at any time from October 21, 1954, to October 21, 1957, employed by Standard Business Forms, Inc., a corporation with principal offices in Gastonia, North Carolina.

2. It is further ordered that the defendant and its surety be and they are hereby discharged from any bond heretofore posted in this proceeding, and that the plaintiffs be taxed with the costs hereof.

This 12th day of August, 1959.

/s/ Wilson Warlick
District Judge:"

The defendant on July 31, 1963, merged with Wallace Press, Inc., an Illinois corporation, and on completion of such merger and on August 31, 1963, this corporation effected a change in its corporate name under the laws of Delaware, and became known as Wallace Business Forms, Inc.

That on October 2, 1964, the defendant filed its request that it be given authority to take the oral depositions of Clyde Walker, Whitzel K. Chastein, and J. B. Hodgins, all of Greenville, South Carolina, three former employees of defendant and who were so employed at the time plaintiff Folk sold his 800 shares of stock to the defendant, and were those employees among others mentioned and named in the buy-sell agreement. Thereafter on October 6, 1964 plaintiffs objected to the taking of the deposition and moved this court for an order that such depositions of Clyde Walker, Whitzell K. Chastein and J. B. Hodgins not be taken on such date stated in the notice of such taking. Within the next several days and

on October 8, 1964, oral arguments on the above motion to take depositions were heard, and this court then ruled that said matter be held in abeyance for a period of one week, with the idea in mind of making a decision founded upon a study of the record thus far made.

Then it was on October 14, 1964 that the defendant moved this court for an order against plaintiffs for contempt of this court upon the grounds set forth in the affidavit of W. E. Hendricks which was attached to said motion and made a part thereof. That Paragraph four (4) of said affidavit is as follows:

"4. That affiant has received information which he believes to be true and upon such information alleges that plaintiffs, either collectively or separately, have violated said consent judgment and consent permanent injunction in that they have, either collectively or separately, employed or caused to be employed in violation of said consent judgment and consent permanent injunction Clyde Walker, Whitzell K. Chastein, and J. B. Hodgins, all three of whom were employed by the defendants at some time during the period between October 21, 1954 and October 21, 1957."

That on the same day, the defendant filed its motion seeking leave to take deposition, said motion containing among other things, the following:

"1. For an order, pursuant to Rule 26 of the Federal Rules of Civil Procedure, granting the defendant leave to take the oral deposition of Clyde Walker, Witzel K. Chastein, and J. B. Hodgins, all of Greenville, South Carolina, —these same three parties having been employees of the defendant at some time during the period between October 21, 1954 and October 21, 1957, said parties having as knowledge of the facts, files, writing, books, papers, and documents pertaining to transactions between them and the plaintiffs.

2. The depositions are for use at the hearing upon defendant's motion to

cite the plaintiffs, either collectively or separately for contempt of the consent judgment and consent permanent injunction previously entered in this case by this Court on August 12, 1959.

3. The defendant is informed and believes that these three persons have knowledge of the facts which will disclose that the plaintiffs, either collectively or separately, have been employing persons previously employed by defendant during the period of October 21, 1954, and October 21, 1957, in violation of said consent judgment and consent permanent injunction, proof of which the defendant cannot otherwise obtain.

4. That defendant desires to take the oral deposition of Clyde Walker, Witzell K. Chastein, and J. B. Hodgins at 9:30 o'clock in the forenoon of Wednesday, October 28, 1964, at the law offices of Rainey, Fant, and Horton, 118 Broadus Avenue, Greenville, South Carolina."

Again this motion was objected to and a hearing was obviously made necessary, and following such hearing and some few days thereafter the motion was allowed, and October 29, was set as the date for the taking of said depositions.

On November 6, 1964, the defendant filed an additional motion under Rule 30 that it desired to take the testimony of Emerson D. Folk, both as an individual and as a principal officer and stockholder of the National Business Forms, Inc., on the 19th of November, 1964, in Greeneville, Tennessee, and without objection such deposition was taken on such date. However plaintiff, Folk, among other things refused to answer 56 of the questions asked of him, taking such position as he indicated, through the advice of his counsel. Actually these questions which he refused to answer were those relating principally to the two printing presses or to matters having to do with the ordering of these presses from the Hamilton Tool Company.

However following a rather lengthy hearing held on August 20, 1965, at Charlotte, when a thorough review of the 56 Interrogatories was made by the court, all of those not otherwise answered in previous depositions by other parties were required to be answered by an order of the court dated at such time.

Later and on November 30, 1964, defendant filed notice of its desire to take the depositions of Calvin W. Jung, President of Hamilton Tool Company of Hamilton, Butler County, Ohio. This deposition to be taken upon Interrogatories, a copy of such Interrogatories being attached to plaintiff's written motion.

Again on December 3, plaintiffs filed notice of their objection to such proposed order for the taking of the deposition of Calvin W. Jung, assigning therein plaintiff's reasons. We there met another roadblock.

On December 7, 1964, defendant filed an additional motion requesting that the court enter an order compelling Whitzell K. Chastein, Clyde Walker, and J. B. Hodgins to answer the questions propounded to them in their depositions heretofore ordered and which were taken on October 29, 1964, and further that Emerson D. Folk, individually and as President of National Business Forms, Inc. be required to answer questions propounded to him and which he had refused to answer on advice of counsel.

A previous finding indicates that subsequently he was ordered to and did answer said questions.

That on January 29, 1965, a hearing was finally had on the defendant's motion requiring Calvin W. Jung to answer the written Interrogatories which he had previously refused to answer, however he was advised and directed by the court to answer only Interrogatories which were directed to him and had a bearing on the printing press, serial number 14,567. This order being predicated entirely upon stipulations entered into between the parties hereto and some of which are copied herein for information.

"1. That the Folk Company, or the plaintiff which ever term may be used,

ordered the machine originally for delivery but later released it to the South Carolina corporation.

2. No deposit was required additionally to that which the plaintiff had placed with the company from which the machine was purchased, and if the original order carried a down payment that was used to the advantage of the South Carolina Corporation.

3. When the machine was ready for delivery the South Carolina corporation had it charged to it, and paid for it.

4. The machine is paid for in full.

5. The other machine not involved was delivered to the Folk Company or the plaintiff, as the circumstance may be and paid for by it."

Following all of the foregoing which proved to be right time consuming and requiring an unusual number of hearings, but on August 20, 1965, the defendant filed with the court a five page affidavit made by W. E. Hendricks all in support of defendant's motion heretofore filed.

Subsequently on September 29, 1965, on motion and notice as the Rules require, a second deposition of Clyde Walker, Emerson D. Folk, J. B. Hodgins, and Whitzell K. Chastein was taken at the designated place and time.

With all of these evidences before the court and in furtherance of a full and complete hearing, this court on September 23, 1966 issued its order to the plaintiffs and each of them that they appear before this court in Charlotte on the 25th day of October 1966 and show cause if any there be, why each of them should not be adjudged guilty of contempt of this court in failing and refusing to obey the consent judgment and the additional consent permanent injunction, each being dated August 12, 1959.

As previously appears in these Findings of Fact, but again set out herein for clarity, Chastein, Hodgins and Walker were employees of Standard Business Forms, Inc. during the period between October 21, 1954 and October 21, 1957, and were obviously among the employees of Standard Business Forms, Inc. referred to in the judgment and the permanent injunction, dated August 12, 1959, and each continued working for Standard until they severed their connections by resignation during the middle of the summer of 1964; on September 5, 1964 these three incorporators organized the Eastern Business Forms, Inc. a South Carolina corporation, with its principal place of business at Greenville, in that state. In late January or early February, 1964, these three men, Chastein, Hodgins and Walker met the plaintiff, Emerson D. Folk in Greeneville, Tennessee, and discussed with him the formation of a business which ultimately became Eastern Business Forms, Inc., at Greenville, South Carolina. The record is silent as to how and why these parties came together on this venture. Thereafter and at some time in February, 1964, the actual date being impossible to determine, Chastein again went to Greeneville, Tennessee and according to his statement, gave to Folk $3,500 in cash which constituted a down payment on a Press to be ordered by plaintiff, National Business Forms, Inc. from Hamilton Tool Company heretofore mentioned. No receipt was given, none was asked for, and no corroboration of this transaction was offered. This press which cost $35,320 upon completion was thereupon ordered from Hamilton Tool Company by National Business Forms, Inc., in the name of National Business Forms and under plans and specifications given to Hamilton Tool Company by such National Business Forms, as directed by Folk. Hamilton Tool at no time until payment was made in September 1964, being in any wise aware that such press was for any purchaser other than National Business Forms. All payments to Hamilton Tool were made direct by Folk through the means of his co-plaintiff, National Business Forms, and by April 23, 1964 payments as made to Hamilton Tool totalled $30,460.

Thereafter these same three individuals, Chastein, Hodgins and Walker again met with Folk in Greeneville, Tennessee, and subsequently Hodgins following such visit, began the building of a collator, which he completed about September 1, 1964, and which was delivered to Eastern Business Forms, in exchange for $10,000 of the original issue of the common stock in Eastern, this being Hodgins' contribution thereto.

That at the time this last press was ordered Hamilton Tool required at least 14–18 months in which to complete and deliver such press, and only accepting orders dependant upon its ability to manufacture and deliver. Thus in January, 1964, when this last order was given and accepted National Business Forms had two presses on order with Hamilton. The one first ordered was numbered 14566 and the latter was assigned No. 14567. Press No. 14566 on completion was delivered to the National Business Forms; and press No. 14567 at the direction of National was delivered in September 1964 to Eastern at its place of business at Greenville, South Carolina.

As the evidence unfolds it is found that Eastern Business Forms received a rubber mat press which the Stereotype Equipment Company had made on order from National Business Forms, in February 1964, and the press was ordered by National to be delivered to Eastern and was actually delivered in October, 1964, shortly after Eastern was incorporated. In addition thereto Folk acting for himself and as President of National Business, guaranteed payment to the Stereotype Equipment Company for this rubber mat press charged to Eastern on account, thereby obligating himself and his co-plaintiff with such liability.

This business, profitable as it may be and lucrative as it is shown by these facts to have been, has three essential items by way of equipment for the carbon inter-leaf form business,—in which all of the above named businesses, Standard, National and Eastern were engaged. (1) a printing press such as was purchased from Hamilton herein; (2) a collator as constructed by Hodgins, and (3) a rubber mat press as purchased by plaintiff from the Stereotype Equipment company.

That Eastern Business Forms originally issued $85,000 of common stock; the stock books indicating that such common stock was held by the following individuals: Chastein $50,000; Walker, $10,000; Hodgins, $10,000; J. C. Keys $10,000; and George Caldwell $5,000.

The testimony indicates and plaintiffs contend that Folk loaned Chastein, evidently sometime in late 1963, the sum of $10,000, through a note secured by a deed of trust on Chastein's home in Gastonia; This paperwriting was never recorded, and no record of its existence offered. In December 1964, Chastein sold such home for $9,400.

Sometime during the first week in September, 1964 Folk loaned Chastein, as plaintiffs contend, the sum of $40,000, with Chastein giving Folk an unsecured note written with pencil, on a small piece of paper. This note was not signed by Chastein's wife and no security whatever was given or collateral posted for securing its payment.

When Eastern was incorporated Chastein invested $50,000, being the monies received, as plaintiffs contend, from the note and the unrecorded deed of trust on Chastein's home and $40,000 on the unsecured personal loan from Folk.

That on September 27, 1964, Eastern Business Forms paid Hamilton Tool Company $35,320 in full for press No. 14567, these funds being monies received by Eastern from the sale of the $85,000 of the original issue of common stock.

Defendant on October 14, 1964, gave notice that it intended to take the depositions of Chastein, Walker, and Hodgins on October 29, 1964,—and following such service it is now made to appear that on October 24, 1964, that Folk and Chastein entered into a five page escrow trust agreement, whereby the $40,000 indebtedness of Chastein to Folk was made payable to the Greene County Bank of

Greeneville, Tennessee, this being in substantiation of the unsecured loan written on the scrap of paper. This subsequent collateral escrow trust agreement was seemingly instigated by Folk and National Business Forms, Inc. on the advice of their attorney, thus hoping to identify Folk's loan to Chastein as a long term loan rather than an investment, and likely for the additional purpose of securing collateral for such loan in the nature of Folk's common stock placed as such collateral for payment.

That during the period embraced between September 1964 when Eastern Business was incorporated until December 1966, Eastern Business had hired more than 19 former Standard Business Form, Inc. employees, and that this constituted 75% of all of Eastern Business employees during this same period.

It is further found as a fact that skilled employees in the field of carbon inter-leaf form are not only hard to find but are in great demand, and that a union contract worker is considered an apprentice for a minimum of two years and generally as long as four years.

That Eastern Business Forms does a large business with customers who have their places of business in North Carolina, South Carolina and Virginia.

That Chastein, as President of Eastern Business Forms, following its incorporation, solicited business by letter in North Carolina, South Carolina and Virginia, advising that Eastern was then in a position to fill orders and further advising that personnel at Eastern had gained extensive training as former employees of Standard; obtaining these dealer-customer names from the files while an employee of Standard.

These facts pretty much recite the evidence heard and the exhibits offered and are made by the court pursuant to Rule 52 of Title 28 U.S.Code.

### DISCUSSION OF EVIDENCE

Much of the evidence offered in this case by plaintiffs in explanation of the facts as they appear is rather difficult to fully understand and to believe. A summary thereof would likely be of value and surely would make such facts more understandable, for all intents and purposes.

Plaintiff Folk and W. E. Hendricks evidently had many disagreements all of which lead to a severance of Folk's business connection with Standard and which resulted in the consent judgment of August 12, 1959, and the consent permanent injunction of such date. The amounts of money and other considerations received by Folk were substantial and clearly indicated the value of his interest sold and the position of Standard in that particular business field.

It wasn't long thereafter until Folk organized National Business Forms, a corporation of Greeneville, Tennessee, and later undertook to employ and did hire certain of those employees who were with Standard when he sold his interest. This action later resulted in an effort on Folk's part to get an opinion from some attorney as to what his rights might be under the consent judgment and the permanent injunction.

Thereafter it appears that Chastein, Walker, and Hodgins continued in their employment with Standard and during some time late in 1963 began to seriously consider the organization of a like business in which they and others associated with them could compete with Standard and other manufacturers of like products. They sought Folk's advice and he willingly met with them and entered into discussions with respect to such proposed competitive business with Standard, which discussions resulted in a press being placed on order by Folk with the Hamilton Tool Company; and Folk also made available advance deposits necessary for the purchase of said press; other talks resulted in the building of a collator by Hodgins, the formation of Eastern, and the various factors involved as is shown from these findings of fact.

At the trial it was rather difficult to get many positive answers, from Folk or Chastein. Every step undertaken by defendant was blocked as long as possi-

ble, leaving the impression that plaintiffs Folk and National wanted to conceal every thing thus far done as much as possible and to make the obtaining of such evidence fraught with great difficulty. I don't believe anything was done which in a sense was not objected to, or that any move was made which after a fashion was not heralded as something to which the defendant would not be entitled. A careful reading of the evidence of Folk and Chastein is indicative that much of that to which they testified was an afterthought and they were trying to piece together as little as possible and leave unsaid a great amount of that which otherwise should easily have been placed in the record. However from it all these Findings of Fact pretty well indicate and conclusively show what actually is involved in this controversy, and certainly the most reasonable inference to be drawn by one who has heard all the facts, read all of the evidence and who in a sense has become entirely familiar with the circumstances and ramifications is that Folk and National by their joint and several actions and conduct have directly and indirectly violated the terms of the consent judgment and the consent permanent injunction, and accordingly are in contempt of this court as a matter of fact and law for so doing.

## CONCLUSIONS OF LAW:

■ We find that proceedings for contempt are classified as criminal and civil.

"The line of demarcation between the two is not easily drawn, and certain acts may have the characteristics of both. In such cases, it is often the nature of the relief sought, and granted, that is determinative. Concerning the two classes, Judge Walter H. Sanborn, Court of Appeals for the Eighth Circuit, In re Nevitt, 117 F. 448, 458, quoted in Bessette v. W. B. Conkey Co., 194 U.S. 324, 328, 24 S.Ct. 665, 48 L.Ed. 997, stated: 'Proceedings for contempts are of two classes,—those prosecuted to preserve the power and vindicate the dignity of the courts and to punish for disobedience of their orders, and those instituted to preserve and enforce the rights of private parties to suits, and to compel obedience to orders and decrees made to enforce the rights and administer the remedies to which the court has found them to be entitled. The former are criminal and punitive in their nature, and the government, the courts, and the people are interested in their prosecution. The latter are civil, remedial, and coercive in their nature, and the parties chiefly in interest in their conduct and prosecution are the individuals whose private rights and remedies they were instituted to protect or enforce.'" Philippe v. Window Glass Cutters League of America, 99 F.Supp. 369 (W.D.Ark.1951).

■ This action obviously is a civil contempt and has been so treated by the court and the parties connected with the controversy.

"Proceedings in civil contempt are between the original parties and are instituted and tried as a part of the main cause. Though such proceedings are "nominally those of contempt" (Worden v. Searls, 1887, 121 U.S. 14, 26, 7 S.Ct. 814, 820, 30 L.Ed. 853), the real purpose of the court order is purely remedial—to coerce obedience to a decree passed in complainant's favor, or to compensate complainant for loss caused by respondent's disobedience of such a decree." Parker v. United States, 153 F.2d 66 (First Cir. 1946).

"A civil contempt proceeding is in effect a continuation of the original suit. The jurisdiction invoked and asserted to make the decree effective is as broad and comprehensive as that which sustains the decree itself. Leman v. Krentler-Arnold Hinge, Last Co., 284 U.S. 449, 52 S.Ct. 238, 76 L.Ed. 389. It is for the benefit of the complainant; the punishment meted out in it is remedial. Gompers v. Buck's Stove & Range Co., 221 U.S.

431, 31 S.Ct. 492, 55 L.Ed. 797, 34 L.R.A., (N.S.) 874." Coca-Cola Co. v. Feulner, 7 F.Supp. 364 (S.D.Tex.1934).

"The absence of wilfulness does not relieve from civil contempt. Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance. See United States v. United Mine Workers, 330 U.S. 258, 303, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884; Penfield Co. [of Cal.] v. Securities & Exchange Commission, 330 U.S. 585, 590, 67 S.Ct. 918, 921, 91 L.Ed. 1117; Maggio v. Zeitz, 333 U.S. 56, 68, 68 S.Ct. 401, 407, [92 L.Ed. 476]." McComb v. Jacksonville Paper Co., 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949).

And finally, the authorities are replete to the effect that

"In deciding whether an injunction has been violated it is proper to observe the objects for which the relief was granted and to find a breach of the decree in a violation of the spirit of the injunction, even though its strict letter may not have been disregarded." See High on Injunctions, 4th Ed. Vol. 2, § 1446; California Fruit Growers Exchange v. Sunkist Drinks, Inc., D.C.S.D.N.Y., 25 F.Supp. 401; Prang Co. v. American Crayon Co., 3 Cir., 58 F.2d 715; John B. Stetson Co. v. Stephen L. Stetson Co., 128 F.2d 981 (2nd Cir. 1942).

I conclude therefore in my thinking that this whole controversy may be summed up as one in which the proof offered under the evidence heard, direct and circumstantial, clearly and convincingly establishes the violation of the decree on which this motion for contempt is laid.

Counsel will agree among themselves as to some date when the cause can again come before the court and where evidence will be heard, all looking toward the ultimate judgment for damages which will be determined by the court, in line with the violation of the decree, and upon such agreement will confer with the court so that the date selected can be found appropriate.